**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **AVIVA BUCK-YAEL,**  Plaintiff,  v.  **WASHINGTON UNIVERSITY,**  Defendant. | Jury Trial Demanded  COMPLAINT |

**COMPLAINT**

1.  Plaintiff Aviva Buck-Yael complains against her former employer, Washington University, for discriminating against her by arbitrarily withdrawing her religious accommodation, harassing her when she engaged in a protected activity by complaining about the arbitrary withdrawal, and terminating her on false pretenses for no reason other than to persecute her for practicing the Orthodox Jewish faith in peace while inconveniencing no one and successfully performing her job duties, which she had been doing for years prior to a new abusive supervisor's arrival.

**NATURE OF THE ACTION**

2.  Washington University's conduct violates the prohibitions against discrimination on the basis of religion contained in Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title

VII"); the Missouri Human Rights Act, Title 12, Ch. 213 R.S.Mo. ("MHRA"); and the St. Louis City Ordinance No. 67119.

3. Additionally, Washington University's retaliatory termination of Plaintiff in response to her complaint about the University's discriminatory conduct violates the National Labor Relations Act ("NLRA") and its protections for workers engaging in concerted activity regarding the terms and conditions of their employment. 29 U.S. Code § 157, 158 (a) (1)

## JURISDICTION AND VENUE

4. The Court may exercise subject-matter jurisdiction over this action because it arises under the laws of the United States. 28 U.S.C. § 1331.

5. The Court may exercise supplemental jurisdiction over the state and local claims. 28 U.S.C. § 1367.

6. Venue is appropriate in this judicial district as the events giving rise to the action occurred here and the parties are residents of this judicial district. 28 U.S.C. §§ 1391(b)(1)-(2).

7. Plaintiff has exhausted the remedies available to her by administrative agencies, having requested and received the Right to Sue from the U.S. Equal Employment Opportunity Commission on January 31, 2023, after filing a complaint timely on October 13, 2020.

## THE PARTIES

8. Plaintiff Aviva Buck-Yael is a citizen of Missouri and a resident of University City, Missouri.

9. Defendant Washington University is a private university located in St. Louis, Missouri, with no religious affiliation.

## FACTS RELEVANT TO ALL CLAIMS

10. Defendant hired Ms. Buck-Yael as a Linux Systems Administrator in October 2014.

11. As part of the negotiations in her hiring process, Ms. Buck-Yael requested a religious accommodation that would allow her to practice her Orthodox Jewish faith.

12. The requested accommodation was twofold: The ability to take unpaid leave to celebrate significant Jewish holidays, including the "High Holidays," and the ability to work from home on Fridays in order to avoid commuting, thereby maximizing her Friday work hours before they had to terminate at sundown in observance of the Sabbath.

13. Shortly after hiring Ms. Buck-Yael, Washington University expeditiously approved her religious accommodation request.

14. Ms. Buck-Yael's religious accommodation came at no cost to Washington University.

15. None of Ms. Buck-Yael's customers or colleagues ever complained about being inconvenienced by Ms. Buck-Yael's religious accommodation.

16. As a result of her strong work ethic and dedication to the University, she was promoted to the role of REDCap Application Administrator in 2017 by her supervisor, Dr. Albert Lai, which increased her level of responsibility.

17. Washington University reaffirmed Ms. Buck-Yael's religious accommodation request after her promotion because it caused them no inconvenience and because they valued her contributions.

18. As REDCap Application Administrator, Ms. Buck-Yael supported over 3,000 Washington University researchers and their associates.

19. In order to succeed in this role, Ms. Buck-Yael took the initiative to master the REDCap application, which allowed her to provide effective leadership to her team, improve service to her internal customers, and improve the REDCap application itself.

20. Supervisors, colleagues, and customers raved about Ms. Buck-Yael's work performance. They consistently praised her attentive customer support, thoughtful solutions, collaborative work style, courteous demeanor, and dedication to the success of her customers. She felt supported and appreciated by all.

21. In November 2018, Washington University hired a new contract project manager, Laura Jaske, to help the REDCap team adapt to a new workflow.

22. Ms. Jaske did not appreciate the open, collaborative work culture of the existing REDCap team and made her negative perception of their work culture and of Ms. Buck-Yael in particular known.

23. During meeting about a REDCap application update on or around February 8, 2019, Ms. Jaske stated that the update would require the REDCap system to be out of service for three full days.

24. In that meeting, Ms. Buck-Yael referred to test-run data in an email that led her to conclude that the update would require no more than a day of application downtime and possibly only three hours.

25. In front of colleagues, Ms. Jaske dismissed Ms. Buck-Yael's input as intrusive and attempted to move on without addressing Ms. Buck-Yael's feedback.

26. As the voice of her customers, Ms. Buck-Yael insisted in the meeting that it would be irresponsible to deprive 3,000 researchers worldwide of REDCap access for three days unnecessarily.

27. Ms. Jaske reluctantly reviewed the data to which Ms. Buck-Yael referred and concluded that Ms. Buck-Yael was likely correct.

28. The REDCap team then agreed to the one-day update plan and completed the update in under three hours, as Ms. Buck-Yael had estimated.

29. Ms. Buck-Yael complained to Mike Isberg, her supervisor, about Ms. Jaske's apparent bias against her. Mr. Isberg said that he would speak with Ms. Jaske. While resolution was pending, Defendant changed Ms. Buck-Yael's reporting structure, and Rachel Komeshak became her supervisor. Ms. Komeshak agreed to have a talk with Ms. Jaske as well about her management style.

30. Instead, Ms. Komeshak issued Ms. Buck-Yael a written warning on or around February 12, 2019, based solely on a complaint from Ms. Jaske. Ms. Jaske targeted Ms. Buck-Yael instead of thanking her for saving 3,000 researchers more than two and a half days of downtime on a crucial application.

31. Ms. Buck-Yael's colleagues in the REDCap update meeting characterized Ms. Buck-Yael's demeanor as professional and courteous; they characterized Ms. Jaske's demeanor as rude and dismissive. Ms. Komeshak ignored both the REDCap team's assessment of the situation and the fact that Ms. Buck-Yael was correct.

32. This incident marked the beginning of Ms. Komeshak's and Ms. Jaske's concerted effort to undermine Ms. Buck-Yael and her professional success.

### Harassment for Complaining of Religious Discrimination

33. After the improper writeup, Ms. Komeshak marginalized Ms. Buck-Yael, terminated their weekly 1-1 meetings, and falsely accused Ms. Buck-Yael of negative intentions.

34. Before Ms. Komeshak became Ms. Buck-Yael's supervisor, Ms. Buck-Yael was engaged in discussions with her previous supervisor, Mike Iberg, regarding the need for role definition so that her performance could be more easily evaluated and expectations made more

5

clear. After her initial meeting with Ms. Komeshak, Ms. Buck-Yael expected the job description review to continue; however, instead, Ms. Komeshak used this need for clarity against Ms. Buck-Yael.

35. Ms. Komeshak refused to review Ms. Buck-Yael's job description, weaponizing its lack of clarity to the point of asking Ms. Buck-Yael why she worked at the university and claiming it was unclear how she contributed.

36. For no apparent reason, Ms. Komeshak denied Ms. Buck-Yael the opportunity to attend the 2019 REDCap Conference after attending in 2017 and 2018, hampering her ability to continue providing the stellar leadership, solutions to customer problems, and innovations for which she was widely praised by her previous supervisor and customers.

37. Ms. Buck-Yael cared so deeply for her customers and the university that, in order to be able to attend, she offered multiple personal sacrifices above and beyond the call of duty—to no avail.

38. When Ms. Buck-Yael offered to pay for her flight to the conference in order to reduce Washington University's portion of her conference expenses, Ms. Komeshak still denied Ms. Buck-Yael permission to attend the conference.

39. When Ms. Buck-Yael offered to work while attending the conference in order to offset the conference admissions fee, Ms. Komeshak still denied Ms. Buck-Yael permission to attend the conference.

40. When Ms. Buck-Yael offered to stay at an AirBnB and walk to the conference in order to reduce Washington University's portion of her conference expenses, Ms. Komeshak still denied Ms. Buck-Yael permission to attend the conference.

6

41. When Ms. Buck-Yael offered to pay all expenses involved in attending the conference as long as she could count the conference days as work days, Ms. Komeshak still denied Ms. Buck-Yael permission to attend the conference.

42. Ms. Buck-Yael was denied permission to attend the conference until she offered to pay all her expenses and use vacation time—the maximum possible disadvantage to her. This, for attempting to obtain the education required for her to continue serving her REDCap customers at the cutting-edge level to which they had grown accustomed during her tenure as REDCap Administrator. Ms. Komeshak added an extra humiliation to the circumstances by explicitly stating that in no way was the University sponsoring her attendance.

43. In October 2019, around the Jewish High Holidays, Ms. Komeshak made clear her animosity towards Ms. Buck-Yael's faith when she arbitrarily withdrew the religious accommodations that Ms. Buck-Yael had been granted by the University since 2014, accommodations that were reaffirmed in 2017 when Ms. Buck-Yael was promoted.

44. If Ms. Buck-Yael wanted to continue practicing the Orthodox Jewish faith, she would have to deplete her vacation time instead of using unpaid leave, and she would have to work longer hours Monday through Thursday in order to leave on Fridays in time to be home by sundown instead of simply working from home on Fridays.

45. On a demonstrably false pretense, Ms. Komeshak issued to Ms. Buck-Yael her second and final written warning on November 15, 2019. Ms. Komeshak claimed that an email sent by Ms. Buck-Yael had not been authorized by management as was the requirement. The manager in question, Ricky Rodriguez, said that Ms. Buck-Yael had in fact obtain proper approval and had correctly followed protocol. Ms. Komeshak knew this, yet still proceeded with her second improper writeup of Ms. Buck-Yael.

46. Ms. Komeshak's fabrications continued when she stated to Ms. Buck-Yael that colleagues had described Ms. Buck-Yael as condescending and unhelpful. Ms. Buck-Yael was understandably shocked and confused. Colleagues denied having said such things about her when Ms. Buck-Yael asked them about it.

**Retaliatory Termination and Damages**

47. Ms. Buck-Yael was distraught by Ms. Komeshak's repeated attempts to sabotage and undermine her, so she sought help from the University's HR department. The HR department informed Ms. Buck-Yael of two options available to her through the University's Formal Review Process: 1) She could petition to have the two improper writeups removed from her file, and 2) She could request to be assigned a new manager.

48. To assess the two options HR offered, Ms. Buck-Yael consulted with her colleagues regarding the issues at play in her two improper writeups and in Ms. Komeshak's allegations that colleagues complained about Ms. Buck-Yael. This consultation is a protected activity under both state and federal law.

49. In December 2019, once Ms. Komeshak heard that Ms. Buck-Yael was attempting to be reassigned to another manager, Ms. Komeshak stated that Ms. Buck-Yael would never be reassigned and threatened Ms. Buck-Yael, suggesting that she better avoid the appearance of creating a hostile work environment lest there be consequences. Ms. Komeshak threatened Ms. Buck-Yael, her direct report, for engaging in a protected activity.

50. Two weeks later, on December 17, 2019, Ms. Komeshak terminated Ms. Buck-Yael, effective immediately, citing the two improper writeups and numerous "counselings."

51. After terminating Ms. Buck-Yael's employment, the University required that Ms. Buck-Yael appeal the termination through their administrative process. Ms. Buck-Yael met with the Dean on March 2, 2020, to plead her case and request reinstatement.

52. Disregarding their own policies and processes after Ms. Buck-Yael's termination as they had before, Washington University failed to respond to Ms. Buck-Yael's follow up on July 13, 2020, and her attorney's follow up on September 15, 2020.

53. While attempting reinstatement at Washington University, Ms. Buck-Yael also sought employment elsewhere to mitigate her damages.

54. At the time of her termination, Ms. Buck-Yael had two children nearing college age and was anticipating free tuition for her children at Washington University or 40% reciprocity on tuition at another school. With the abrupt termination of her employment, Ms. Buck-Yael's family was forced to find other options.

55. The career sabotage and religious discrimination that Rachel Komeshak and Washington University inflicted on Ms. Buck-Yael impacted not only Ms. Buck-Yael but also her family. They bore witness to her stripped religious accommodations, making it more difficult to observe the rites and holidays they hold dear. They lost out on perhaps the greatest benefit that employment in higher education offers: the chance for one's children to obtain a first-rate education without bankrupting their own futures or putting their parents in deep debt.

### COUNT I
### DISCRIMINATION ON THE BASIS OF RELIGION
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 USCS § 2000e-2

56. Plaintiff incorporates and re-alleges the preceding paragraphs as if fully set forth herein.

57. Defendant was an employer within the meaning of the Act. 42 USCS § 2000e(b).

58. Defendant was aware or should have been aware of their obligation under the Act not to discriminate against any employee regarding her compensation, terms, conditions, or privileges of employment, because of her religion.

59. Defendant was aware of Plaintiff's Orthodox Jewish faith from the start of her employment.

60. Plaintiff's religion is unrelated to her ability to perform her job duties.

61. Plaintiff's religious accommodation caused Defendant no inconvenience, and Defendant never reported any inconvenience caused by Plaintiff's religious accommodation.

62. Defendant retracted Plaintiff's religious accommodation for no reason despite its lack of inconvenience to them.

63. Defendant allowed Plaintiff to be treated differently and worse on the basis of her religion under Ms. Komeshak's supervision than she had been under previous supervision.

## PRAYER FOR RELIEF

64. Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A. Find that Defendant violated Title VII by willfully discriminating against Plaintiff on the basis of her religion;

B. Award Plaintiff back pay;

C. Award costs of maintaining this suit, including reasonable attorney's fees and court costs; and,

D. Award all further relief that this Court deems just and proper.

## COUNT II
## DISCRIMINATION ON THE BASIS OF RELIGION
## IN VIOLATION OF THE MISSOURI HUMAN RIGHTS ACT
## Mo.Rev.Stat. § 213.055

65. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

66. Defendant was an employer within the meaning of the Act. Mo. Rev. Stat. § 213.010.

67. Defendant was aware or should have been aware of their obligation under the Act not to discriminate against any employee regarding her compensation, terms, conditions, or privileges of employment, because of her religion.

68. Defendant was aware of Plaintiff's Orthodox Jewish faith from the start of her employment.

69. Plaintiff's religion is unrelated to her ability to perform her job duties.

70. Plaintiff's religious accommodation caused Defendant no inconvenience, and Defendant never reported any inconvenience caused by Plaintiff's religious accommodation.

71. Defendant retracted Plaintiff's religious accommodation for no reason despite its lack of inconvenience to them.

72. Defendant allowed Plaintiff to be treated differently and worse on the basis of her religion under Ms. Komeshak's supervision than she had been under previous supervision.

## PRAYER FOR RELIEF

73. Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A. Find that Defendant violated the MHRA by willfully discriminating against Plaintiff on the basis of her religion;

B. Award actual damages;

C. Award punitive damages;

D. Award the costs of maintaining this action, including reasonable attorneys' fees and court costs; and,

E. Any other relief this Court deems just and necessary.

### COUNT III
### HARASSMENT ON THE BASIS OF RELIGION
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 USCS § 2000e-2

74. Plaintiff incorporates and re-alleges the preceding paragraphs as if fully set forth herein.

75. Defendant was an employer within the meaning of the Act. 42 USCS § 2000e(b).

76. Defendant was aware or should have been aware that Plaintiff's previous supervisors granted her religious accommodation shortly after she was hired and reaffirmed it when she was promoted.

77. Plaintiff's job duties did not change in any way prior to Defendant's retraction of Plaintiff's religious accommodation.

78. There was no reason related to Defendant's business needs and Plaintiff's duties to retract Plaintiff's religious accommodation; rather, in retracting Plaintiff's religious accommodation, Defendant was trying to make Plaintiff's working conditions as undesirable as possible.

79. In requiring Plaintiff to use paid vacation days to observe religious holidays rather than unpaid leave, and in requiring Plaintiff to work longer hours Mondays through Thursdays in order to accommodate her early commute home on Fridays to observe the Sabbath rather than simply allowing her to work from home, Defendant knowingly made it difficult for Plaintiff to

practice the weekly and annual observances of her Orthodox Jewish faith while keeping to the work schedule that followed the retraction of her accommodation.

## PRAYER FOR RELIEF

80. Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A. Find that Defendant violated Title VII by harassing Plaintiff on the basis of her religion;

B. Award Plaintiff back pay;

C. Award costs of maintaining this suit, including reasonable attorney's fees and court costs; and,

D. Award all further relief that this Court deems just and proper.

## COUNT IV
## RETALIATION IN VIOLATION OF
## THE MISSOURI HUMAN RIGHTS ACT
## Mo.Rev.Stat. § 213.055

81. Plaintiff incorporates and re-alleges the preceding paragraphs as if fully set forth herein.

82. Plaintiff exercised the proper protocol in seeking assistance from HR in response to experiencing discrimination and harassment from Defendant.

83. Plaintiff was engaging in a protected activity in seeking input from her colleagues as part of completing the next steps that HR recommended to her.

84. Defendant knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

85. Defendant threatened Plaintiff upon learning of her engagement in a protected activity, stating that her attempts at changing her reporting structure through HR's recommended

process would fail and that she should be wary of appearing to create a hostile work environment in engaging in a protected activity.

86. Two weeks later, Defendant terminated Plaintiff in retaliation for Plaintiff's engaging in a protected activity.

## PRAYER FOR RELIEF

87. Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A. Find that Defendant violated the MHRA by willfully retaliating against Plaintiff in terminating her for engaging in a protected activity;

B. Award actual damages;

C. Award punitive damages;

D. Award the costs of maintaining this action, including reasonable attorneys' fees and court costs; and,

E. Any other relief this Court deems just and necessary.

## COUNT V
## RETALIATION IN VIOLATION OF
## THE NATIONAL LABOR RELATIONS ACT
## 29 U.S.C. §§ 151-169

88. Plaintiff incorporates and re-alleges the preceding paragraphs as if fully set forth herein.

89. Plaintiff exercised the proper protocol in seeking assistance from HR in response to experiencing discrimination and harassment from Defendant.

90. Plaintiff was engaging in a protected activity in seeking input from her colleagues as part of completing the next steps that HR recommended to her.

91. Defendant knew or should have known that retaliation against an employee engaging in a protected activity was a violation of federal law.

92. Defendant threatened Plaintiff upon learning of her engagement in a protected activity, stating that her attempts at changing her reporting structure through HR's recommended process would fail and that she should be wary of appearing to create a hostile work environment in engaging in a protected activity.

93. Two weeks later, Defendant terminated Plaintiff in retaliation for Plaintiff's engaging in a protected activity.

94. Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

  A. Find that Defendant violated the NLRA by willfully retaliating against Plaintiff in terminating her for engaging in a protected activity;

  B. Award back pay for the time Plaintiff was unemployed;

  C. Award the costs of maintaining this action, including reasonable attorneys' fees and court costs; and,

  D. Any other relief this Court deems just and necessary.

## JURY DEMAND

95. Plaintiff demand a trial by jury of all issues raised in this Complaint.

Dated: April 18, 2023                                   Respectfully submitted,

                                                        AVIVA BUCK-YAEL

                                                  By:   /s/      Kristen Prinz
                                                        One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen Prinz  6291900 (IL)

Amit Bindra 6308593 (IL)
One East Wacker Drive, Suite 1800
Chicago, Illinois 60601
P: (312) 212-4450
F: (312) 284-4822
kprinz@prinz-lawfirm.com
abindra@prinz-lawfirm.com