**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

AVIVA BUCK-YAEL,                    )
                                   )
          Plaintiff,               )
                                   )
    v.                             )          No. 4:23-cv-00492-JAR
                                   )
WASHINGTON UNIVERSITY,             )
                                   )
          Defendant.               )

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Washington University's motion for summary judgment.  (ECF No. 54).  Plaintiff Aviva Buck-Yael (Plaintiff) filed her opposition (ECF No. 56), and Defendant has replied (ECF No. 63).  This matter is now fully briefed and ripe for disposition.  For the reasons set forth below, the Court will grant Defendant's motion.

**I.    PROCEDURAL HISTORY AND BACKGROUND**

This case involves claims of religious harassment and retaliation brought by Plaintiff against her former employer, Washington University.  The operative complaint is Plaintiff's First Amended Complaint (FAC) (ECF No. 13) which is based on claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII).  The FAC states three causes of action set forth in three counts: Count I – discrimination on the basis of religion in violation of Title VII; Count II – harassment on the basis of religion in violation of Title VII; and Count III – retaliation in violation of Title VII.  On March 28, 2024, the Court granted in part and denied in part Defendant's motion to dismiss each of these claims.  (ECF No. 23).  The Court dismissed Plaintiff's Count I, religious discrimination, on the basis that Plaintiff had failed to exhaust her administrative remedies related to that claim and failed to adequately state a claim for religious

1

discrimination.  *Id.*  However, the Court denied Defendant's motion to dismiss as to Counts II

and III, Plaintiff's harassment and retaliation claims.  Plaintiff's religious harassment and

retaliation claims are the subject of Defendant's motion for summary judgment.

Viewing the evidence and all reasonable inferences in the light most favorable to

Plaintiff, the record establishes the following:

A.    Plaintiff's Employment with Defendant

Plaintiff began her employment with Defendant on October 14, 2014 as an Operations &

Systems Technician II.  In approximately 2017, Defendant deployed a software program called

"REDCap," and Plaintiff thereafter moved into the role of REDCap Application Administrator.

Plaintiff worked with a team of employees supporting the operation and users of REDCap.

During her time on the REDCap team, Plaintiff reported to Rachel Komeshak.  While the parties

disagree as to the exact date Ms. Komeshak became Plaintiff's supervisor, they agree that Ms.

Komeshak supervised Plaintiff from at least February 2019 through her termination in December

2019.  Plaintiff's complaints primarily stem from the perceived animosity of Ms. Komeshak

towards her, which Plaintiff contends was motivated by her religion.  From the time Ms.

Komeshak began supervising Plaintiff, Ms. Komeshak knew that Plaintiff identified as an

Orthodox Jew, and she was aware that Plaintiff had a religious accommodation in place.

B.    Plaintiff's Religious Accommodations

As an Orthodox Jew, Plaintiff was at times required to take off work to observe Jewish

high holidays, and Defendant accommodated this.  Between the time Plaintiff began working for

Defendant until October 2019, Defendant permitted Plaintiff to take unpaid leave on Jewish

holidays without first exhausting accrued paid leave (e.g. her vacation time).  Defendant had no

written policy governing the processing of religious accommodation requests by employees in

2

2019.  Defendant generally tried to work with employees to accommodate requests, and it appears from the record that Defendant's general practice was for supervisors (such as Ms. Komeshak) to work with individual employees to assist in determining what accommodations might be reasonable in response to a request.  Ms. Komeshak was aware that Defendant had previously permitted Plaintiff to take off Jewish holidays as unpaid leave as an accommodation.

In October 2019, Ms. Komeshak attended a Human Resources (HR) training for management during which the topic of paid versus unpaid leave was discussed.  HR explained that employees should be required to deplete paid leave before using unpaid leave as an accommodation, if appropriate.[1]  Ms. Komeshak emailed Plaintiff to inform her that her requests for unpaid leave through October would be approved, but after that, Plaintiff would be required to exhaust any paid leave available to her before utilizing unpaid leave as an accommodation to cover absences for religious holidays.  Defendant did not remove Plaintiff's ability to take time off for religious holidays, and this modification of Plaintiff's religious accommodation did not result in Plaintiff being unable to take off work for any religious holidays during the remainder of her employment.

On October 23, 2019, Plaintiff replied to Ms. Komeshak's email stating that she had previously received approval to take unpaid leave to observe Jewish holidays without first

---

[1] Plaintiff objected to Defendant's statement of this fact, arguing that it was not supported by the deposition testimony attached to Defendant's statement of uncontroverted material facts. Defendant conceded that two pages of Ms. Komeshak's deposition were apparently inadvertently omitted.  Plaintiff attached the missing pages to her own statement of uncontroverted material facts (ECF No. 57-3 at pp. 119-121); thus, this fact is properly before the Court.  Fed R. Civ. P. 56(c)(3).  The Court further finds that this fact is not reliant on hearsay, as Plaintiff contends, because it is not offered for the truth of the matter asserted but rather to demonstrate the effect on the listener, Ms. Komeshak.  *United States v. Wright*, 739 F.3d 1160, 1170-71 (8th Cir. 2014) (citing cases) ("[A] statement offered to show its effect on the listener is not hearsay.").  Defendant cites this fact to argue that Ms. Komeshak modified Plaintiff's religious accommodation to comport with the stated instructions from HR.

exhausting her vacation and questioned whether Ms. Komeshak was unaware of this arrangement or if it was being rescinded.  On November 12, 2019, Ms. Komeshak replied that she had consulted with Defendant's HR department.  She explained that there was no standing policy for using unpaid leave for religious holidays and reiterated that Plaintiff would be required to exhaust paid leave for future time-off requests.

Plaintiff's religious practices also required her to refrain from performing any work on the Sabbath, which begins at sunset every Friday.  During the majority of her employment with Defendant, Plaintiff and her team members were permitted to work from home one day per week.  This policy provided the opportunity for Plaintiff to elect to work from home every Friday to ensure she was at home by sundown, i.e. the start of the Sabbath.  On October 8, 2019, Ms. Komeshak announced the end of this once-weekly work-from-home policy.  Ms. Komeshak stated in an email to the REDCap team that, going forward, no one would be permitted to maintain a standing work-from-home day, and any future work-from-home days would need to be approved by a supervisor at least forty-eight (48) hours in advance.  Ms. Komeshak made this change to increase efficiency, productivity, and collaboration among the team.

In response to this change, Plaintiff contacted Ms. Komeshak to request a religious accommodation since she could no longer work from home every Friday.  On November 1, 2019, Plaintiff sent Ms. Komeshak a message via Teams explaining that her religion required her to refrain from performing any work after sundown on Fridays.  Plaintiff proposed that she be permitted to adjust her hours to work a longer day Monday through Thursday to allow her to work a half day on Fridays to ensure she was home before sundown on the Sabbath.  Ms. Komeshak agreed to this schedule modification.  Ms. Komeshak forwarded this message to another manager, stating that "I want to make a reasonable accommodation for [Plaintiff] on this

4

request." (ECF No. 55-28). At no point during her employment was Plaintiff required to work after sundown on Fridays.

Plaintiff objects to the changes in the work-from-home policy and her accommodation for religious holidays, arguing that Ms. Komeshak modified these arrangements to her detriment. With respect to these policy changes, Plaintiff testified that it was her belief "that [Ms. Komeshak] used [Plaintiff's] religious faith as part of her attempt to get [Plaintiff] to leave the university." (ECF No. 57-1 at p. 225).

C. Conflict with Ms. Komeshak

The parties agree that during 2019, Plaintiff and Ms. Komeshak encountered difficulties working together. Defendant acknowledges that Ms. Komeshak gossiped and complained to other employees about Plaintiff, including at least one instance in which she used a profane word. Plaintiff does not contend that this word was a religious slur or in any way referenced her religion. The record is devoid of evidence that this gossip included any reference to Plaintiff's religion, and neither party alleges whether Plaintiff was even aware of this "gossip" during her employment.

Plaintiff contends that Ms. Komeshak also treated her unfairly on a number of occasions. For instance, Plaintiff felt unfairly criticized by Ms. Komeshak in front of colleagues. The parties do not dispute that during various meetings that Plaintiff attended, Ms. Komeshak was critical of the entire REDCap team's performance and voiced that to the group. Ms. Komeshak directed her critical comments to the entire room of REDCap employees and not at Plaintiff specifically. Neither Ms. Komeshak nor Plaintiff mentioned Plaintiff's religion during any of these REDCap team meetings. Plaintiff also complained that Ms. Komeshak regularly cancelled one-on-one meetings with her but acknowledges that Ms. Komeshak cancelled one-on-one

5

meetings with others on the REDCap team due to her busy schedule.  Plaintiff also contended that Ms. Komeshak barred her from attending an annual work conference.  In actuality, the undisputed evidence reflects that while Plaintiff and others had been sent to the annual North American REDCap conference in years past, Defendant stopped sending any employees to the conference in April 2019 due to budgetary constraints.  When Plaintiff offered to pay for her own travel and accommodations and use vacation days to attend the conference, Defendant had no issue with that and approved the request.  At no point during the discussions about this conference did anyone reference Plaintiff's religion.

David Heskett—a colleague of Plaintiff's on the REDCap team—recalled that "Ms. Komeshak often demonstrated a hostile and toxic attitude towards [Plaintiff]," and that "Ms. Komeshak treated [Plaintiff] differently and worse than how she treated [Plaintiff]'s colleagues." (ECF No. 57-2 at p. 4).  However, Mr. Heskett provided no specific examples beyond these general opinions.  Plaintiff further alleges that Ms. Komeshak issued disciplinary warnings to her that were false and unfounded, but legitimate reasoning for each disciplinary action is borne out in the record.

D. Plaintiff's First Written Warning

Plaintiff's first written warning stemmed from reports of Plaintiff's alleged misconduct in team meetings.  In 2017, the REDCap team began utilizing a project management style called "agile" that emphasizes collaboration and teamwork.  On more than one occasion during team meetings, Plaintiff expressed frustration, interrupted others who were speaking, argued, or raised her voice.  Following a meeting in February 2019, Plaintiff's coworker, Jeremy Leyden, went to Ms. Komeshak to express that Plaintiff's behavior during the meeting had made him and his

fellow coworkers uncomfortable. At another meeting run by Laura Jaske, Plaintiff became frustrated and raised her voice, characterizing a particular project decision as irresponsible.

Plaintiff takes issue with Defendant's reliance on her coworkers' reports in explaining the basis for disciplinary action, contending that these reports are inadmissible hearsay that cannot be used to justify summary judgment. However, the Court agrees with Defendant that these statements are not hearsay, as they are not offered to prove the truth of the matter asserted. Rather, they demonstrate the effect on the listener. *Wright*, 739 F.3d at 1170-71. Regardless of whether her coworkers' reports were accurate, which is immaterial,[2] Defendant cites them to establish that these reports (and not Plaintiff's religion) caused Ms. Komeshak to issue disciplinary warnings to Plaintiff. Further, Plaintiff's hearsay arguments are largely unpersuasive, as "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)).

Based on these reports, Ms. Komeshak issued a written warning to Plaintiff on February 12, 2019. The written warning cited "recurrent issues with regard to behavior during team scrum meetings…." (ECF No. 55-7). The warning emphasized the necessity of collaboration and instructed Plaintiff to attend daily scrum meetings, maintain professional conduct, and allow others to speak. The written warning stated that if Plaintiff failed to adhere to these expectations, she could be subject to future disciplinary action up to and including termination. The written

---

[2] Where an adverse action is based on an employer's contention that the employee committed misconduct, proof that the employee never actually violated company rules does nothing to establish discrimination. *Cross v. UPS*, No. 21-3819, 2023 WL 3858611, at *1-2 (8th Cir. June 7, 2023) (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012)). Rather, to prove pretext, an employee must show more than that their employer was mistaken; they must show that their employer did not honestly believe that they had violated company rules and took adverse action against them anyway. *Id*.

warning contained no references to Plaintiff's religion, and Plaintiff and Ms. Komeshak did not discuss Plaintiff's religion during the meeting in which Ms. Komeshak presented the written warning to Plaintiff.

E. <u>Plaintiff's Continued Performance Issues</u>

Following this first written warning, issues with Plaintiff's work performance continued from Ms. Komeshak's perspective.  In April 2019, Plaintiff hosted a client meeting during a time Ms. Komeshak could not attend despite a previous directive from Ms. Komeshak that she needed to be included in all such intake meetings.  Plaintiff participated in two more meetings in which Ms. Komeshak was not in attendance (though Plaintiff contends that another employee scheduled those meetings).  (*See* ECF No. 57-1 at pp. 113-120).

On June 13, 2019, Ms. Komeshak issued Plaintiff a 2019 performance evaluation in which she noted that she was "not satisfied" with Plaintiff's performance.  (ECF No. 55-10). The performance review cited opportunities for Plaintiff to improve communication with PMO and technical leadership, focus on assigned tasks and projects, and improve response time for help requests.

By September 2019, Ms. Komeshak contacted HR and department leadership regarding her desire to terminate Plaintiff's employment.  In a September 18, 2019 email, Ms. Komeshak stated that there were "ongoing issues with [Plaintiff]…. In addition to [Plaintiff's] toxic attitude, we have had issues with time and attendance and her prioritization of work."  (ECF No. 55-20). Ms. Komeshak provided examples of Plaintiff's noncompletion of work and unwarranted reprioritization of assigned tasks.  Ms. Komeshak asked to move forward with terminating Plaintiff's employment.  After discussions with HR and department leadership, Plaintiff was not

terminated in September 2019. Instead, Ms. Komeshak continued to document her concerns with Plaintiff's conduct.

   F. Final Written Warning

        In late 2019, Ms. Komeshak received additional reports of various issues with Plaintiff's performance. At least three of Plaintiff's coworkers approached Ms. Komeshak to express their difficulties working with Plaintiff. Further, on November 12, 2019, Plaintiff sent an email containing a significant mistake to thousands of REDCap users. The email alerted users to an upcoming server outage and referenced the wrong day for the anticipated outage. Plaintiff sent a follow-up email to the thousands of REDCap users correcting the day of the server outage after receiving replies from confused users. (ECF No. 57-1 at p. 157). Months prior, Ms. Komeshak had sent the REDCap team a set of written requirements that must be followed before sending communications to REDCap users. One of the required steps was to ensure that a supervisor, either Ms. Komeshak or Mr. Rodriguez, had approved the final communication before sending it out. The parties disagree on whether a discussion Plaintiff had with Mr. Rodriguez constituted the required "approval" to send the email. It is clear from the record, however, that Ms. Komeshak believed that Plaintiff had not received the required approval.

        On top of the complaints from Plaintiff's coworkers, Ms. Komeshak proceeded with issuing Plaintiff a final written warning on November 15, 2019. The final written warning cited the November 12, 2019 email incident as well as "ongoing concerns from coworkers in the ability to work collegially and collaboratively" and concerns from coworkers that Plaintiff was "condescending or unhelpful when approached for guidance with issues." (ECF No. 57-7). The final written warning stated, in relevant part, that it was to serve "as a final written warning regarding recurrent issues including, [sic] refusal to follow protocols and procedures established

9

by management, [sic] and the ability to work with other members of ICS." *Id.*  The final written warning also advised Plaintiff that "[n]o work from home opportunities will be granted during [a] 9-month probation period." *Id.*  The final written warning did not mention Plaintiff's religion.

Plaintiff was presented with this final written warning during a meeting with Ms. Komeshak and one of Defendant's HR representatives.  During this meeting, neither Ms. Komeshak nor HR mentioned Plaintiff's religion.  The HR representative told Plaintiff during this meeting that if Plaintiff disagreed with the warning, she could petition to have it removed.

Plaintiff met with HR consultant Heidi White on November 27, 2019 to dispute her final written warning.  During the meeting, Plaintiff expressed her opinion that the final written warning was not justified and complained about Ms. Komeshak's management.  She also mentioned concerns that her religious accommodation allowing her to take unpaid leave on religious holidays had been rescinded.  Neither Plaintiff nor Ms. White recall Plaintiff mentioning that she felt she had been subjected to religious discrimination or harassment during this meeting.  Ms. White also did not recall sharing any details regarding the content of this meeting with Ms. Komeshak.  Prior to Plaintiff's termination, Ms. Komeshak had no knowledge of any purported complaint Plaintiff may have had regarding religious discrimination or harassment.

G.  Plaintiff's Actions Following the Final Written Warning and Termination

Following her final written warning, Plaintiff approached coworkers to ask for their opinions about her behavior.  Plaintiff asked coworkers about their recollections of events in meetings.  She complained about Ms. Komeshak, shared that she had been "written up for a typo," and expressed that Ms. Komeshak's disciplinary actions were unfair.  (ECF No. 57-1 at p.

10

168).  Some of Plaintiff's coworkers reported to Ms. Komeshak that Plaintiff's venting about her

discipline made them feel uncomfortable and forced to choose a side.  Following these reports,

Ms. Komeshak met with Plaintiff on December 3, 2019 to give her a verbal warning.  Ms.

Komeshak told Plaintiff that while she was free to discuss the final written warning and her

matter with HR, she should be careful to avoid creating a toxic work environment.  Plaintiff's

religion and religious accommodations were not discussed during this December 3, 2019

meeting with Ms. Komeshak.[3]

Despite this warning from Ms. Komeshak about creating an unpleasant working

environment, Plaintiff continued to appeal to her coworkers.  On December 16, 2019, Mr.

Iverson, a newly hired REDCap employee, reported to Ms. Komeshak that Plaintiff asked him to

provide screenshots of a Teams conversation between Mr. Iverson and Ms. Komeshak.  Mr.

Iverson reported that Plaintiff then took him into a private conference room and complained to

him that Ms. Komeshak was "trying to get rid of her."  (ECF No. 55-22 at p. 2).  Mr. Iverson

contacted Ms. Komeshak to tell her that he was "very uncomfortable with this situation as a new

employee."  *Id*.[4]

---

[3] Plaintiff disputes this fact by stating that the evidence cited by Defendant merely establishes that Plaintiff could not *recall* discussing religion or religious accommodations.  Plaintiff has not properly controverted this fact.  Rule 56(e) is clear that a party opposing summary judgment may not rely on mere allegations or denials of the movant's stated facts; a stated fact must be opposed by setting forth "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

[4] Plaintiff objects that this fact relies on inadmissible hearsay.  Again, the Court finds that this statement is not offered to prove the truth of the matter asserted, i.e. that Mr. Iverson *was* made uncomfortable by Plaintiff's actions.  Rather, Defendant offers these statements to demonstrate the effect on the listener, Ms. Komeshak, which was that she proceeded with further disciplinary action in light of her belief that Plaintiff had continued to create an unhealthy work environment.  Further, because this evidence could be admissible at trial through testimony from Mr. Iverson himself, Plaintiff's dispute is improper.  *See Blocker*, 684 F.3d at 793.  Additionally, Plaintiff also relies on these same facts in support of her opposition to summary judgment.

Following Mr. Iverson's report of these interactions with Plaintiff, Defendant terminated Plaintiff's employment.  Ms. Komeshak made the determination to terminate Plaintiff's employment in consultation with HR and other members of leadership.  Ms. Komeshak and the Associate Dean for Health and Data Science, Dr. Phillip Payne, met with Plaintiff on December 17, 2019, to present her with a termination letter.  During this meeting, no one mentioned Plaintiff's religion or religious accommodations.  The termination letter cited the prior formal warnings issued to Plaintiff, prior coaching Plaintiff had received, and the December 16, 2019 interactions with Mr. Iverson who described the "uncomfortableness of the working environment due to these discussions."  (ECF No. 55-23).  Plaintiff's termination was effective December 17, 2019.

On October 13, 2020, Plaintiff filed a Charge of Discrimination (Charge) with the Equal Employment Opportunity Commission (EEOC) in which she alleged that she was subject to unlawful discrimination and retaliation based on her religion.

H.  The Parties' Arguments

Defendant argues that it is entitled to summary judgment on both Plaintiff's religious harassment and retaliation claims.  As to the harassment claim, Defendant argues that Plaintiff failed to adduce evidence of harassment that is so extreme and pervasive as to have violated Title VII.  Defendants argue that the standard to establish an unlawful hostile work environment is high, and Plaintiff has simply failed to present evidence to overcome the high standard.  Instead, Defendant argues that the actions with which Plaintiff takes issue were isolated incidents resulting in minor inconvenience.

Defendant emphasizes any allegations or facts that appear to rely on Defendant's alleged failure to accommodate Plaintiff's religious practices are not relevant here because she no longer

has a claim of failure to accommodate. Moreover, Defendant argues that Plaintiff has otherwise failed to come forth with facts that Defendant ever actually withdrew a religious accommodation, but instead merely required Plaintiff to first exhaust her paid leave to take off religious holidays in conformity with HR practices. Additionally, Defendant asserts that the floating work-from-home day was never a religious accommodation provided specifically to Plaintiff but a privilege afforded to the entire REDCap team until it was revoked for all REDCap employees in the name of efficiency and in-office collaboration. Defendant then stresses that when the floating work-from-home day policy was rescinded, Defendant immediately granted Plaintiff's request for a religious accommodation in the form of a schedule modification that allowed her to be home by sundown on the Sabbath. Defendant also argues that Plaintiff has failed to adduce evidence that any of its actions were actually motivated by Plaintiff's religion, and therefore Defendant is entitled to summary judgment as to Plaintiff's harassment claim.

Defendant separately argues that Plaintiff failed to administratively exhaust her retaliation claim under Title VII because Plaintiff did not include in her Charge allegations regarding retaliation based on participation in protected activity recognized under Title VII. Defendant argues that, instead, Plaintiff's Charge merely alleges that Plaintiff was terminated for discussions with coworkers protected by the National Labor Relations Act (NLRA), which failed to evince any protected conduct under Title VII.

Defendant also contends that even if Plaintiff had administratively exhausted her retaliation claim, it is due summary judgment because Plaintiff's termination was not caused by her participation in any activity protected under Title VII. Defendant cites to various caselaw from within this Circuit emphasizing that to succeed on such a claim, the plaintiff must show that their protected activity was the but-for cause of the adverse employment action and that if their

13

termination was "at least in part" motivated by non-retaliatory reasons, which Defendant contends is the case here, then Defendant is entitled to summary judgment. (ECF No. 54 at p. 11) (quoting *Walker v. Mo. Dep't of Corrs.*, No. 20-cv-4251, 2022 WL 2007393, at *8 (W.D. Mo. June 6, 2022), *aff'd*, No. 22-2881, 2023 WL 2822131 (8th Cir. Apr. 7, 2023)). Defendant also asserts that Plaintiff has not come forth with any evidence indicating that Ms. Komeshak—the key decisionmaker in Plaintiff's termination—had any awareness that Plaintiff complained to HR about the alleged revocation of her religious accommodations. According to Defendant, because the decision-maker was unaware of Plaintiff's alleged protected activity, Plaintiff cannot establish the requisite element of causation to prove that Plaintiff was terminated because of her alleged protected activity.

Defendant argues that summary judgment should also be granted in its favor because Plaintiff cannot point to evidence that Plaintiff's termination was motivated by anything but issues with her work performance. Defendant contends that the timing between Plaintiff's complaint to HR about her religious accommodations and her termination is not sufficient to establish any presumption of causation. Defendant points to significant evidence of ongoing issues with Plaintiff's work performance that were documented well before Plaintiff ever allegedly engaged in protected complaints and that Plaintiff engaged in misconduct after making her complaint, justifying her termination.

Plaintiff asks the Court to deny Defendant's motion. Plaintiff argues that Ms. Komeshak specifically targeted Plaintiff and harassed her because of her religion. In support, Plaintiff cites to evidence that Ms. Komeshak took several actions towards her that demonstrated hostility such as criticizing her in front of colleagues and banning her from an annual conference that served as a career development opportunity. Plaintiff urges the Court to view all of Ms. Komeshak's

actions that appear unrelated to her religion in conjunction with her actions that did affect Plaintiff's religious practices to establish that they were all part of a pattern of behavior truly motivated by Plaintiff's membership in a protected class.  Plaintiff emphasizes that Ms. Komeshak, despite knowing that Plaintiff was previously permitted to take leave for Jewish holidays without using paid vacation time, required Plaintiff to use paid vacation time for leave to observe Jewish holidays.  This change negatively affected her by preventing her from taking vacation time for other reasons.  Plaintiff also asserts that Ms. Komeshak targeted Plaintiff's ability to work from home on Fridays that accommodated her religious practice of observing the Sabbath and that Ms. Komeshak rescinded a religious accommodation when she changed the work-from-home policy.  Plaintiff emphasizes language included in this Court's order on Defendant's previous motion to dismiss permitting Plaintiff to pursue her claims at the motion to dismiss stage to support her contention that she was targeted for harassment because of her religion.

As to her retaliation claim, Plaintiff argues that Defendant's motion must be denied because she has properly exhausted her administrative remedies, and her protected activities were the cause of her termination.  Plaintiff states that the Court has already heard and rejected Defendant's arguments regarding failure to exhaust at the motion to dismiss stage.  Plaintiff also contends that the protected activity she conducted was more than just her conversation with HR opposing the removal of her religious accommodation; there were also emails to Ms. Komeshak about her religious accommodations as well as her December 16, 2019 conversation with Mr. Iverson.  On the issue of causation, Plaintiff argues that she was fired because she complained about management and it is "at the very least disputed that Mr. Komeshak was aware of [Plaintiff]'s protected activity…."  (ECF No. 56 at p. 15).  Plaintiff also contends that

Defendant's rationale for terminating Plaintiff has changed over time and is thus evidence that such reasons were pretextual.

In reply, Defendant restates much of its argument raised in its motion and memorandum of law in support.  Defendant emphasizes that Plaintiff has generally failed to come forth with evidence indicating genuine issues of material fact, and therefore Defendant's statement of undisputed material facts remains largely unopposed.  Defendant further contends that even Plaintiff's additional statements of undisputed facts are not sufficient to create genuine issues of material fact that would permit this case to proceed to trial.  Defendant disagrees that Plaintiff's emails to Ms. Komeshak and interactions with Mr. Iverson were protected activity and argues that each of its actions towards Plaintiff were justified by legitimate, non-discriminatory rationale.  Defendant otherwise argues that Plaintiff has failed to adequately rebut the arguments raised in its motion for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the Court reviews the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party.  *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015) (citation omitted).  To withstand a motion for summary judgment, the nonmovant has the "burden of presenting evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in their favor."  *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  The nonmovant, however, "must do more than simply show that

there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). "The movant is entitled to judgment as a matter of law 'when the plaintiff has failed to make a sufficient showing of the existence of an essential element of her case.'" *Whitworth v. Kling*, 90 F.4th 1215, 1218 (8th Cir. 2024) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996)).

## III.   DISCUSSION

Defendant is entitled to summary judgment on Plaintiff's harassment and retaliation claims. Plaintiff fails to adduce any causal nexus between the actions she complains of and her religion. Further, they are far from severe and pervasive enough to have materially altered the conditions of Plaintiff's employment. As to Plaintiff's retaliation claim, it fails on the merits. Plaintiff's Charge cited enough detail to have administratively exhausted this claim, but the record is now clear that the majority of her allegedly protected complaints did not comprise protected activity and did not cause her termination.

### A. Plaintiff's Harassment Claim

"To establish a prima facie case of hostile work environment [under Title VII], a plaintiff must show: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action." *Clobes v. 3M Co.*, 106

F.4th 803, 807 (8th Cir. 2024) (cleaned up).  "In order to show that the harassment affected a term or condition of employment, the conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment." *Yelder v. Hegseth*, — F.4th —, No. 24-2731, 2025 WL 2373355, at *8 (8th Cir. Aug. 15, 2025) (quoting *Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018)).  This is a two-pronged inquiry utilizing an objective and subjective component.  *See id.*  "To satisfy the objective prong of the inquiry, the conduct must be more than merely offensive, immature or unprofessional; it must be extreme."  *Id.* at *9 (quoting *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005)).  "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment."  *Id.* (quoting *Bloker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016)).  To determine whether the alleged actions were sufficiently hostile, a court must "examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance."  *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006).  Plaintiff has failed to come forth with sufficient evidence to show that she was subjected to a hostile work environment so severe and pervasive as to violate Title VII.

The focus of the parties' arguments is on elements three and four of Plaintiff's harassment claim, i.e. whether the conduct Plaintiff found unfair was motivated by her religion and whether it was severe and pervasive enough to form an actionable hostile environment.  Plaintiff cites the following examples of Ms. Komeshak's conduct that she alleges created a hostile work environment: (1) the change in the work-from-home policy preventing her from teleworking

every Friday to ensure she was home before the start of the Sabbath; (2) the change in Plaintiff's ability to use unpaid leave for religious holidays before exhausting her paid leave; (3) ridicule/criticism of Plaintiff in front of colleagues; (4) the revocation of Plaintiff's opportunity to attend the annual REDCap conference; (5) Ms. Komeshak's cancelling of one-on-one meetings with Plaintiff; and (6) unjustified discipline issued to Plaintiff "under false pretenses."

      a. <u>Motivation</u>

To amount to actionable harassment, the cited conduct must have been motivated by the plaintiff's membership in a protected class; allegations of a "generally toxic workplace" and "interpersonal conflict" not tied to a protected class are not enough. *See Hill v. SSM*, No. 4:24-cv-01292-CDP, 2025 WL 2391399, at *3 (E.D. Mo. Aug. 18, 2025). The record is clear that the majority of the actions Plaintiff complains of were not motivated by, or even related to, her religion. As to Plaintiff's contention that she was ridiculed or criticized in front of her colleagues, the record reflects that Ms. Komeshak was critical of the entire REDCap team's performance and directed that criticism at the whole room in team meetings rather than at Plaintiff personally. Similarly, Ms. Komeshak's cancellation of one-on-one meetings was not unique to Plaintiff. Ms. Komeshak cancelled one-on-one meetings with multiple employees due to her busy schedule. Plaintiff was also not personally barred from attending the annual REDCap conference. Defendant discontinued its sponsorship of conference attendance for all REDCap employees in 2019 due to budgetary constraints. None of these actions targeted Plaintiff specifically, and none related to her religion. Ms. Komeshak's gossiping and complaining about Plaintiff to other employees, while perhaps unprofessional, was unrelated to Plaintiff's religion and demonstrates no more than interpersonal conflict and not religious

animus.  Mr. Heskett's declaration that Plaintiff was treated differently than her colleagues is irrelevant without any specific examples of such differential treatment.[5]

Even the change in the work-from-home policy was a neutral policy change not related to anyone's religion.  Defendant did not revoke a religious accommodation for Plaintiff by changing the work-from-home policy.  All employees in the REDCap group previously enjoyed the privilege of working from home for one day per week and were equally affected by the recission of this policy.  The record demonstrates that Ms. Komeshak removed the weekly work-from-home day for everyone on Plaintiff's team to facilitate collaboration and increase productivity and efficiency.  Plaintiff points out no more than an incidental relationship between this policy and her religious practices.  It is moreover fatal to Plaintiff's proposed interpretation that when she explained her potential religious conflict with the policy change to Ms. Komeshak and requested that her weekly schedule be modified to accommodate her religious practices, Ms. Komeshak *granted* this religious accommodation to allow Plaintiff to continue to observe the Sabbath without interference.  The Court declines to take Plaintiff's suggestion that liability should be imposed on an employer for implementing a religion-neutral, generally applicable policy that happens to necessitate a religious accommodation for one employee, especially when the employer then *grants* the requested religious accommodation.  Such a result would run contrary to established law.  *See, e.g., Clobes*, 106 F.4th at 807 (upholding dismissal of religious harassment claim, as defendant's implementation and enforcement of company-wide COVID-19

---

[5] Further, the personal opinions of Mr. Heskett are not *facts* upon which summary judgment can be opposed.  *See Jefferson v. MHM Support Servs.*, No. 4:24-cv-1308-CDP, 2025 WL 1380138, at *2 (E.D. Mo. May 13, 2025) (personal opinion not supported by admissible evidence is not a "fact" upon which a party may rely on summary judgment).

vaccination policy lacked any causal connection to one employee's religion and fell far short of demonstrating any religiously discriminatory animus).

Plaintiff's reliance on *EEOC v. GMC*, 11 F. Supp. 2d 1077 (E.D. Mo. 1998) and *Quick v. Donaldson Co.*, 90 F.3d 1372 (8th Cir. 1996) in this context is unpersuasive. While *GMC* and *Quick* observed that an employer's hostile actions need not explicitly refer to the protected class at issue to be considered, each decision made clear that harassing actions may demonstrate a pattern of actionable conduct "if they were directed at members of a protected class more than toward individuals who are not in a protected class." *GMC*, 11 F. Supp. 2d at 1081; *see also Quick*, 90 F.3d at 1379; *Hathaway v. Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1997) (noting that gender-neutral behavior could be considered when a clear causal nexus existed with earlier sexual harassment, and noting that the "critical inquiry" is whether members of a protected class are subject to material disadvantages that employees outside of that protected class are not). Plaintiff offered no evidence that she was treated differently than other employees with respect to Ms. Komeshak's generally applicable actions. Plaintiff offers only her own speculation, and no actual evidence, that each action she found unwelcome was motivated by her religion.

    b. <u>Severity</u>

Plaintiff has failed to raise an issue of triable fact as to the fourth element of her harassment claim, that all of Defendant's actions together were severe and pervasive enough to rise to the level of a hostile work environment. Plaintiff urges the Court to consider all of Ms. Komeshak's actions in the context of her "interference with Ms. Buck-Yael's long-standing religious accommodations" as evidence that together, they form a pattern hostility motivated by Plaintiff's religion that affected the terms of her employment. (ECF No. 56 at p. 8). The only arguable "interference" with Plaintiff's religious accommodations that occurred was Ms.

Komeshak's determination that Plaintiff would be required to exhaust her paid leave to cover religious holiday absences before she could be approved for unpaid leave as an accommodation. Defendant argues—and on review of Eighth Circuit law, the Court agrees—that Plaintiff's complaints about this action do not approach the level of severity required to establish an actionable hostile environment under Title VII.

As an initial matter, Defendant urges the Court to ignore arguments regarding Plaintiff's religious accommodations altogether, as an employer's failure to adequately accommodate a plaintiff's religious practices is a separate claim of religious discrimination not at issue here. Defendant is correct that a failure to accommodate *can* form a distinct cause of action, which the Court does not herein consider.  However, to the extent Plaintiff argues that Ms. Komeshak's "interference" with her religious accommodation was part of a pattern of religious hostile actions constituting unlawful harassment, the Court considers Plaintiff's argument but finds it unpersuasive.

The record does not support a reasonable inference that the change in Plaintiff's accommodation for religious holidays meaningfully altered the conditions of her employment, both when viewed by itself and collectively with all of the other actions Plaintiff complains of. The parties do not dispute that in October 2019, Ms. Komeshak notified Plaintiff that after October, she would be required to use any paid leave available to her to take off work for religious holidays before she could use unpaid leave as an accommodation.  Ms. Komeshak did not remove, withdraw, or rescind Plaintiff's religious accommodation altogether as she contends. Plaintiff was still excused from work on religious holidays.  There is no genuine dispute that in the two months that Plaintiff remained employed by Defendant, Plaintiff was never prevented from taking time off for a religious holiday.  There is also no argument that this arrangement

requiring Plaintiff to exhaust paid leave before utilizing unpaid leave would not have complied with Title VII if offered to Plaintiff as an accommodation from the outset of her employment. Plaintiff argues that this modification detrimentally affected her because it decreased the vacation time available to her for non-religious reasons. Even when viewed in the light most favorable to Plaintiff as an undesirable change in her time off allowance, this singular action falls far short of the egregious and pervasive abuse required to establish actionable harassment.

In totality, the record lacks evidence of the level of hostility and abuse required to form a hostile work environment, especially when the actions Plaintiff complains of, save one, were wholly unrelated to her religion. Eighth Circuit law is clear that the standard for establishing a harassment claim is high, as Title VII is meant to prohibit a truly abusive pattern of conduct based on a protected class and not to impose a civility code policing all displeasing conduct in the workplace. *See Yelder*, 2025 WL 2373355 at *9; *Paskert v. Kemna-Asa Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020) ("some conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to violate Title VII."); *see also Lehr v. Nike IHM, Inc.*, No. 4:19-cv-942-RLW, 2021 WL 1611720, at *14 (E.D. Mo. April 26, 2021) (collecting cases) (finding that pattern of unwelcome criticism and exclusion not motivated by race did not form a racially hostile work environment even when coupled with daily utterances of racially derogatory term and one-time physical altercation with plaintiff that "was subjectively very upsetting").

At most, Plaintiff has presented a handful of isolated incidents that she found unfair or inconvenient. None of these actions involved physical threats, routine humiliation, offensive language, or a meaningful interference with Plaintiff's ability to complete her work based on her membership in a protected class. Even the modification of her religious accommodation still

allowed her to practice her religion without interference and served as a singular incident in which her employer's actions intersected with her religious practices. Thus, her harassment claim fails as a matter of law.

### B. Plaintiff's Retaliation Claim

#### a. Exhaustion

As an initial matter, the Court finds that Plaintiff adequately exhausted administrative remedies as to her retaliation claim. The parties agree that in order to bring a retaliation claim under Title VII, a plaintiff must first exhaust administrative remedies by timely presenting a charge of discrimination describing the alleged retaliation to the EEOC and then receiving a notice of their right to sue. *See Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) (citing 42 U.S.C. § 2000e-5(b), (c), (e)). Defendant renews its argument from its prior motion to dismiss (ECF No. 16) that Plaintiff's Charge did not adequately exhaust a claim of retaliation because she did not describe performance of protected activity under Title VII. In her Charge, Plaintiff alleged that she was terminated in "direct violation of the National Labor Relations Act" as she was fired for "discussions with colleagues in the course of crafting my petition to HR…." (ECF No. 57-13 at pp. 5-6). Defendant contends that Plaintiff's description of having engaged in conduct protected by the NLRA falls short of evincing conduct protected by Title VII. This argument misses the mark. Concerted activity protected by the NLRA *can also* constitute protected oppositional activity under Title VII. Title VII prohibits employers from discriminating against an employee who has "opposed any practice made unlawful" by Title VII. 42 U.S.C. § 2000e-3(a). Construing the facts in the light most favorable to Plaintiff, discussions with coworkers in the course of crafting her HR petition could include Plaintiff's opposition to conduct made unlawful by Title VII. "Because persons filing charges with the

EEOC typically lack legal training, those charges must be interpreted with the utmost liberality in order not to frustrate the remedial purposes of Title VII." *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988). Plaintiff has now offered further detail regarding the content of her discussions by offering evidence that she complained to HR regarding the purported "withdrawal" of her religious accommodations in the meeting during which she discussed her petition to remove prior disciplinary warnings. While the Charge did not exhaustively describe the contents of those communications, that level of detail was not required.

Plaintiff argues, and the Court agrees, that Defendant's citation to *Clyburn v. LGC Assocs.*, No. 4:10CV191–DJS, 2010 WL 2518467, at *4 (E.D. Mo. June 14, 2010) is misplaced here. In that case, the court concluded that the plaintiff had not described protected activity under Title VII in his charge of discrimination, which stated that he was retaliated against for "asking defendant if defendant's employees could start a union." *Id*. at *4. The court aptly noted that "Plaintiff's attempt to start a union, however, is not protected by Title VII." *Id*. This is not a clear-cut case involving conduct that is only protected by the NLRA and not by Title VII.

The Court finds that Plaintiff's Charge sufficiently set forth a description of the claims now expanded upon by the record on summary judgment.

      b.  Protected Activity

Plaintiff cannot prove the elements of a prima facie case of retaliation. To establish a prima facie case of retaliation under Title VII, a plaintiff must prove: "(1) [s]he engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that the engagement in a protected activity is the but-for cause of the adverse employment action." *Warren v. Kemp*, 79 F.4th 967, 973 (8th Cir. 2023). Protected activity under Title VII includes a plaintiff's opposition to practices made unlawful by Title VII. 42 U.S.C. § 2000e–3(a). "An

employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation." *Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008). A plaintiff "need not establish that the conduct he opposed was in fact prohibited under Title VII; rather he need only demonstrate that he had a good faith, reasonable belief that the underlying challenged conduct violated Title VII." *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007).

While the parties agree that Plaintiff conducted *some* protected activity, they disagree regarding which of Plaintiff's actions qualify. Both agree that Plaintiff's November 27, 2019 complaints to HR about the alleged withdrawal of her religious accommodations was protected activity. Plaintiff offers a more expansive view of the actions she believes constituted protected activity. In addition to her November 27, 2019 conversation with HR, Plaintiff contends that the following communications also count as protected oppositional activity: (1) Plaintiff's October 23, 2019 email to Ms. Komeshak in response to the modification of her leave accommodation, in which Plaintiff explained that she was previously approved to take unpaid leave for Jewish holidays and asked if Ms. Komeshak was unaware of this or if she was "rescinding the Institute's previously established arrangement without notice" (ECF No. 57-4 at p. 2); (2) Plaintiff's November 20, 2019 email to Ms. Komeshak in which she stated that due to the change in the treatment of her vacation time, she would "no longer be able to take days off vacation days for family events" (ECF No. 57-6 at p. 2); and (3) a December 16, 2019 conversation between Plaintiff and Mr. Iverson in which Plaintiff complained that Ms. Komeshak's treatment was "unfair" and she was "out to fire her" (ECF No. 56 at p. 14). Plaintiff alleges that this collection of protected activity led Defendant to terminate her employment.

26

The emails Plaintiff sent to Ms. Komeshak in October and November 2019 were not protected activity. While a tone of dissatisfaction could be inferred from Plaintiff's emails, Plaintiff did not "oppose" unlawful discrimination in her emails to Ms. Komeshak. In her October 23, 2019 email, Plaintiff asked Ms. Komeshak whether she was aware of the prior arrangement regarding her religious accommodation or if she intended to rescind it. Plaintiff voiced no objection to unlawful conduct in this email. Likewise, in her November 20, 2019 email, Plaintiff requested to adjust her vacation schedule in light of the new leave arrangement and gave Ms. Komeshak notice of upcoming Jewish holidays during which she would utilize vacation. Plaintiff's discussion with her supervisor regarding the promulgation of her religious accommodations did not, in this case, constitute protected activity. While Plaintiff now voices her opposition to the modification of her leave accommodation, she did not express this opposition in her emails to Ms. Komeshak. Thus, these emails do not comprise protected activity. Even accepting arguendo that these emails, to which Plaintiffs ascribes much weight, comprised protected activity, Plaintiff's claim still fails on the element of causation described below, as they did not in any way demonstrated by the record lead to her termination.

Plaintiff's December 16, 2019 conversation with Mr. Iverson also falls short of protected activity. The parties agree that Mr. Iverson's report of his discomfort with this conversation was the last act instigating Plaintiff's termination. Plaintiff does not dispute that during these interactions with Mr. Iverson, she asked him to provide her with screenshots of his private instant messages with Ms. Komeshak and then took him into a conference room to complain about Ms. Komeshak's intent "to get rid of her." (ECF No. 57 at pp. 34-35).[6] Plaintiff's only addition as to

---

[6] Plaintiff's own deposition testimony cited in support of her factual allegation further undercuts her assertion that her conversation with Ms. Komeshak was protected activity: "I remember telling [Mr. Iverson] that it was my belief that [Ms. Komeshak] was attempting to set the ground

the contents of this conversation with Mr. Iverson was that she complained to Mr. Iverson "regarding Ms. Komeshak's unfair treatment" and "expressed that she believed Ms. Komeshak was out to fire her." *Id*. at p. 60. Plaintiff's communications to Mr. Iverson do not constitute oppositional activity sufficient to defeat summary judgment without any evidence that she attributed Ms. Komeshak's "unfairness" to her religion or religious accommodations. *Genosky v. Minnesota*, 244 F.3d 989, 993 (8th Cir. 2001) (finding summary judgment on retaliation claim was proper where plaintiff complained only of "unfair" treatment and not "unlawful discriminatory treatment"); *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (finding plaintiff's complaints were not protected activity because she did not attribute defendant's objectionable actions to sex discrimination in her complaints); *see also Wilder v. Honeywell Fed. Mfg. & Techs., LLC*, No. 4:24-cv-00305-RK, 2024 WL 4567290, at *7 (W.D. Mo. Oct. 24, 2024) (in dicta, "Plaintiffs must also attribute the complained-of conduct to discrimination.").

This leaves Plaintiff's November 27, 2019 conversation with HR as the sole protected activity Plaintiff engaged in prior to her termination. However, Plaintiff has not established a submissible case on the element of causation.

     c.   <u>Causation.</u>

The record does not reveal any triable issue as to causation. To state a prima facie case of retaliation, Plaintiff must demonstrate that her protected activity was the "but-for" cause of her termination. *Warren*, 79 F.4th at 973. This is a demanding standard. If a plaintiff's termination was motivated "at least in part" by legitimate reasons unrelated to any protected activity, the

---

work to fire me. I also told him that [Ms. Komeshak] is a good manager to work with, that not everybody else has issues with her, and that working for the Institute For [sic] Informatics was an amazing place to work." (ECF No. 57-1 at p. 186).

protected activity was not, as a matter of law, the but-for cause of the termination. *See Harrell v. Robinson*, 703 Fed. App'x. 440, 444 (8th Cir. 2017) (protected activity must be the "dispositive" action, not merely a substantial or motivating factor in the employer's decision); *Walker*, 2022 WL 2007393, at *8 (protected complaints of sexism could not be but-for cause of termination that was motivated at least in part by plaintiff's insubordination and unsatisfactory job performance); *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) (finding, in the context of a motion to dismiss, that a termination letter citing legitimate, non-retaliatory reasons for her termination foreclosed the possibility that plaintiff's threats to pursue an EEO complaint, which were also mentioned in the termination letter, were the but-for cause). The undisputed evidence establishes that Defendant relied not just in part but *entirely* on legitimate performance and misconduct concerns in terminating Plaintiff's employment.

It is undisputed that the termination letter describing the reasons for Plaintiff's dismissal relied in part on her accumulated disciplinary warnings, which were unrelated to her alleged protected activity. Plaintiff's February 2019 written warning arose from Plaintiff's uncollaborative behavior in team meetings and reports that this behavior made at least one coworker uncomfortable. This initial written warning was issued prior to any of the alleged protected activity. The Court also finds Defendant's note significant, albeit not dispositive, that Ms. Komeshak expressed that cause existed to seek Plaintiff's termination in September 2019, prior to all of the actions Plaintiff alleges comprise her protected activity. Ms. Komeshak's opinion that the transgressions prior to Plaintiff's protected activity warranted dismissal on their own underscores the point that the performance history cited in Plaintiff's termination letter motivated her termination in combination with subsequent transgressions. Plaintiff's final written warning, issued in November 2019, relayed continued concerns completely independent

29

of any protected activity.  It cited reports from coworkers about Plaintiff's condescending and unhelpful approach, difficulties collaborating, and an email Plaintiff had sent to thousands of REDCap users that contained a significant error after Plaintiff failed, in Ms. Komeshak's view, to obtain the required supervisor approval to send that email.  None of these actions bore any relationship to Plaintiff's alleged protected activity, and they were cited as reasons that her performance had reached the level of termination.

Defendant relied in large part on Mr. Iverson's December 16, 2019 report of his interactions with Plaintiff, described at length in her termination letter, as the final straw justifying terminating her employment.  As explained above, the Court finds Plaintiff's argument that this conversation was protected activity to be unpersuasive and unsupported by the evidence. Further, Plaintiff was warned in early December 2019 that while sharing concerns regarding discipline and her HR petition was *not* prohibited, continuing to cause her coworkers discomfort was.  When Plaintiff caused discomfort to Mr. Iverson on December 16, 2019 by requesting that he send her screenshots of his messages with Ms. Komeshak and taking him into a conference room alone to voice grievances about their shared supervisor, she defied Defendant's instruction.[7]  The parties do not disagree about these material facts.

The reasoning for Plaintiff's termination has not morphed over time as Plaintiff alleges. Plaintiff seems to suggest that Defendant is inconsistent in its reasoning for her termination

---

[7] The Court does not herein hold that an employer may lawfully take an adverse action against an employee any time the employee's complaints cause discomfort to their coworkers.  To the contrary, there are conceivable scenarios in which an employee's complaints or communications that *do* qualify as protected oppositional activity could spark discomfort in the workplace. Perceived discomfort does not shield an employer from liability.  Here however, viewing the totality of the record, it is clear that Plaintiff has fallen far short of creating a triable issue of fact as to whether this December 16, 2019 conversation was protected activity, as there is no record evidence that it included opposition to purportedly unlawful behavior.

because it has offered multiple reasons that Plaintiff was terminated.  The record is consistent that Plaintiff's termination was justified by *both* her accumulated disciplinary history followed by her creation of an uncomfortable work environment even after she was warned to discontinue behavior that made her coworkers uneasy.  While her interaction with Mr. Iverson was the final act, it was not on its own dispositive.  Plaintiff seems to suggest that it is inconsistent for Defendant to have asserted at different times that the final terminable action Plaintiff committed was on the one hand complaining about management and, on the other hand, creating an unhealthy working environment for her coworkers.  The distinction between the two is illusory.

There is also no genuine dispute that Ms. Komeshak did not know about Plaintiff's November 27, 2019 complaints to HR about the "withdrawal" of her religious accommodations. Plaintiff attempts to dispute this fact by pointing to her own deposition in which she testified that Ms. Komeshak told her that she had heard Plaintiff requested a new supervisor and that Plaintiff would just need to figure out how to work with her.  Plaintiff drew no nexus between this reference and her complaints about religious accommodations.  No rational factfinder could extrapolate from Ms. Komeshak's comment that she knew specifically that Plaintiff had complained to Defendant's HR about the alleged revocation of her religious accommodation. Therefore, it is clear that Ms. Komeshak did not have actual or constructive knowledge of this complaint, vitiating any causal connection between Plaintiff's November 27, 2019 HR complaint and her subsequent termination.  *See Hervey*, 527 F.3d at 722.

Plaintiff disagrees with the basis for the disciplinary history that led, in part, to her termination by accusing Ms. Komeshak of issuing "false" written warnings under "false pretenses."  However, Plaintiff's disagreements as to whether her coworkers' reports were accurate are unavailing, as Plaintiff has presented no evidence that Ms. Komeshak intentionally

31

manufactured the reasons for the written warnings she issued to Plaintiff based on religious animosity. *Hervey*, 527 F.3d at 724 (plaintiff's evidence "must do more than raise doubts about the wisdom and fairness of the supervisor's opinions and actions. It must create a real issue as to the genuineness of the supervisor's perceptions and beliefs" to support a submissible case of retaliation); *see also Cross*, 2023 WL 3858611, at *1-2.

Even assuming Plaintiff could establish a prima facie case of retaliation, which she cannot, Defendant emphasizes that the disciplinary history culminating in her disobedience as to Ms. Komeshak's final verbal warnings forms a legitimate explanation for her termination that Plaintiff has not shown to be pretextual.  Plaintiff offers little argument to rebut this point. Plaintiff's complaint attacked the legitimacy of the disciplinary warnings she received by offering allegations that she was not, in fact, condescending or unhelpful as her coworkers reported.  However, Plaintiff's contention that the disciplinary warnings were inaccurate does nothing to establish that they were motivated by her religion, and her accusation that these warnings were made under "false pretenses" is simply not supported by the record before the Court.

In sum, Plaintiff cannot establish the essential elements of a retaliation claim under Title VII, and Defendant is entitled to judgment on this claim as a matter of law.

## IV.    CONCLUSION

The Court concludes that the evidence in the record does not give rise to a genuine factual dispute as to whether Defendant harassed or retaliated against Plaintiff in violation of Title VII.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Washington University's motion for summary judgment (ECF No. 54) is **GRANTED**.

Dated this 23rd day of October, 2025.

_____

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE